IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


CRYSTAL B.,[1]

          Plaintiff,

v.

COMMISSIONER SOCIAL SECURITY
ADMINISTRATION,

          Defendant.

Case No. 6:18-cv-01602-YY

OPINION AND ORDER

YOU, Magistrate Judge:

    Plaintiff Crystal B. seeks judicial review of the final decision by the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381-1383f. This court has jurisdiction to review the Commissioner's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(g)(3). For the reasons set forth below, the Commissioner's decision is AFFIRMED.

---

[1] In the interest of privacy, the court uses only plaintiff's first name and the initial of her last name and does the same for other individuals whose identification could affect plaintiff's privacy.

**PROCEDURAL HISTORY**

Plaintiff filed applications for DIB and SSI on January 14, 2015, alleging a disability onset date of January 1, 1997. Tr. 13, 188-202. Her date last insured is December 31, 2010. Tr. 15. The Commissioner denied plaintiff's claim on May 15, 2015, and again upon reconsideration on June 18, 2015. Tr. 13. Plaintiff filed a written request for a hearing on July 7, 2015. Tr. 138. On April 12, 2017, plaintiff appeared for a hearing before Administrative Law Judge ("ALJ") Mark Triplett. Tr. 13. At the hearing, plaintiff amended her alleged disability onset date to January 31, 2009. *Id.* After receiving testimony from plaintiff and a vocational expert, Vernon G. Arne, the ALJ issued a decision on June 13, 2017, finding plaintiff not disabled within the meaning of the Act. Tr. 13-24. The Appeals Council denied plaintiff's request for review on November 24, 2018, making the ALJ's written decision the Commissioner's final decision and subject to judicial review by this court. Tr. 1-3; 42 U.S.C. § 405(g); 20 C.F.R. § 422.210.

**STANDARD OF REVIEW**

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). This court must weigh the evidence that supports and detracts from the ALJ's conclusion and "'may not affirm simply by isolating a specific quantum of supporting evidence.'" *Garrison v. Colvin*, 759 F.3d 995, 1009-10 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)). This court may not substitute its judgment for that of the Commissioner when the evidence can reasonably support either affirming or reversing the decision. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Instead, where the evidence is susceptible to more than one rational interpretation, the

Commissioner's decision must be upheld if it is "supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted); see also *Lingenfelter*, 504 F.3d at 1035.

## SEQUENTIAL ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920; *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006) (discussing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)).

At step one, the ALJ found plaintiff had not engaged in substantial gainful activity since her amended alleged onset date of January 31, 2009. Tr. 15. At step two, the ALJ determined plaintiff suffered from the following severe medical impairments: major depressive disorder, recurrent, severe with psychotic features; posttraumatic stress disorder ("PTSD"); and borderline intellectual functioning. *Id.*

At step three, the ALJ found plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. Tr. 16. The ALJ next assessed plaintiff's residual functional capacity ("RFC") and determined she could perform the full range of heavy or very heavy work as defined in 20 C.F.R. § 404.1567, but was limited to "simple, routine tasks with a reasoning level of 1 or 2" and "occasional contact with the general public and with coworkers." Tr. 18.

At step four, the ALJ found plaintiff was unable to perform her past relevant work as a vault cashier. Tr. 22-23.

At step five, the ALJ found that considering plaintiff's age, education, work experience, and RFC, she could perform jobs that existed in significant numbers in the national economy, including laundry laborer, hand packager, and vehicle cleaner. Tr. 23-24. Thus, the ALJ concluded plaintiff was not disabled at any time from January 31, 2009, the alleged onset date, through June 13, 2017, the date of the ALJ's decision. Tr. 24.

## DISCUSSION

Plaintiff contends the ALJ erroneously rejected her subjective symptom testimony, the medical opinion evidence, and the lay witness testimony of her husband and sister.

### I. Subjective Symptom Testimony

#### A. Function Report

Plaintiff completed a function report on February 6, 2015. Tr. 249-56. She reported that she did not want to leave her house due to social anxiety, paranoia, and nervousness. Tr. 249. She would "hear things," and "always" saw "stuff from the corner of [her] eyes" that was not there. *Id.* She had nightmares about a prior abusive relationship, and could not stop thinking about why she had stayed with the abuser and did not call the police. Tr. 250.

Plaintiff cared for three of her children. Tr. 250. Because her boyfriend worked, she cooked, cleaned, and did laundry. Tr. 250-51. She reported spending about 15 minutes a day on each chore. Tr. 251. Plaintiff prepared "easy stuff" for her children during the day and would "try [to cook] a nice dinner." *Id*. However, it took her "all day" to prepare meals because she did not know what to make and depended on internet recipes. *Id*.

Plaintiff was able to drive, but reported she could not go out alone because she needed "someone there for backup." Tr. 252. However, she was capable of driving alone if necessary. Tr. 256. Plaintiff went shopping twice a month for an hour at a time. Tr. 252.

Plaintiff played games with her children, Tr. 250, but felt like a "crapy [sic] mom" because, although she made sure her children ate and showered, she never took them anywhere. Tr. 253. For hobbies, plaintiff said, "We color, play puzzles, game, sewing." Tr. 253. In response to the question, "How often and how well do you do these things?," plaintiff responded, "All the time and pretty good." *Id*. She stated that she used to be an outside person, who swam, bar-b-qued, and did "outside family thing[s]," but "now I like to do all indoor stuff." *Id*. She did not like to be out of the house very long because she did not want anyone to start talking with her or seeing what she was doing. Tr. 252.

Regarding personal care, plaintiff lacked the energy to shower some days. Tr. 251. She did not usually fix her hair, and sometimes she would shower but not wash her hair. *Id*.

In terms of social activities, plaintiff spoke with her sister on the phone "every day," attended church and social groups twice every three months, and tried "to do group stuff at the school," but did not always go. Tr. 253. She believed nobody liked her, she was not close with her family in California, and she did not "really know" her neighbors. Tr. 254. Social activities caused her to "sweat real bad" and she would "go home and cry" if she felt like she did something wrong. *Id.*

Plaintiff claimed that her psychological impairments affected her ability to walk, talk, hear, see, remember, complete tasks, concentrate, follow instructions, and get along with others. *Id.* She said she did not walk, could only pay attention for 30 minutes, and did not finish what she started. *Id.* She said she was "50/50" "good" at following written instructions for cooking

but "horrible" at following directions for "putting stuff together like [a] dresser." *Id.* Plaintiff said she got along well with authority figures and had never been fired from a job because of problems getting along with other people. Tr. 254-55.

   B.   **Hearing Testimony**

At the April 2017 hearing, plaintiff testified that she lived with her husband and three children, ages three, four, and seven. Tr. 39. She testified that her husband usually worked 30 hours per week. Tr. 39. She and her aunt were primarily responsible for taking care of the children. *Id.* Plaintiff's aunt came over to plaintiff's house twice a week and other times when plaintiff asked her to, and helped plaintiff clean and went to the store with her. Tr. 39, 48. Plaintiff walked her oldest child a short distance to school in the morning and only drove a car when she needed to go to medical appointments. Tr. 39-40.

Plaintiff testified that her mental health impairments made it "hard to get up during the day." Tr. 43. She had "outbursts sometimes," could not control her anger, and felt "nervous a lot of [the] time." Tr. 43. She would "try to do things with the kids, but if it involve[d] going somewhere," she felt like she was "going to have a heart attack almost." Tr. 44. Plaintiff indicated that her nervousness stemmed from her belief that people knew she had "mental problems" and looked at her differently because of it. *Id.* She testified that taking her children to a park where there were not a lot of people around made her nervous because she "constantly fel[t] like something bad [wa]s going to happen." *Id.*

In discussing her medication, plaintiff stated that her anxiety medication "was helping," but she discontinued it due to weight gain. Tr. 45. She also found counseling "was making [her] feel better," but stopped going because she "couldn't control" herself at home, and her husband moved out. *Id.* For a period of time, she kept her children home because she "didn't feel like

they were safe at school." *Id.* Plaintiff stated that ultimately her medication was helpful, but it gave her "really bad headaches" and did not "take the inside fear away." *Id.*

Plaintiff described that her anxiety, depression, and PTSD stemmed from an extremely abusive relationship she had with the father of one of her children. Tr. 45-46. Plaintiff's ex-boyfriend locked her in a room and beat her for no reason, harassed her at work, had friends vandalize her car, broke into her apartment on numerous occasions, repeatedly violated restraining orders, stole their daughter for a week, and attacked her in front of a store. Tr. 46-47. She alleged that she was fired from her job at a casino because the physical injuries inflicted on her by her abusive ex-boyfriend caused her to miss too many days of work. Tr. 46, 51. However, plaintiff further detailed that her employer was also "laying off hundreds of people" at that time "because it was just getting too slow." Tr. 46. Eventually, plaintiff grabbed some diapers and shoes, and fled to Oregon with her daughter. *Id*.

Plaintiff admitted that her angry outbursts were due, in part, to stressful events, such as an increase in rent and her truck breaking down. Tr. 49-50. She described that she "always [felt] pushed for time," never had "any time for [her]self," had "to do everything" herself, and "everything just ma[de] [her] so mad." Tr. 51. Noting that plaintiff was in "a more normalized type of relationship," the ALJ asked plaintiff what prevented her from being able to work a fulltime job where it was "quiet" and she was not being harassed. Tr. 52. Plaintiff responded that sometimes she felt like she "lost days," would get her days "mixed up," felt so "dumb" that she did not "even know [her] own name half of the time," could not talk with people, and spent days in isolation. Tr. 52-53. Even though she had not been in an abusive relationship for almost seven years, she felt like she relived it "every single day." Tr. 53. She stated that her husband and aunt would take care of her children when she had to "lock [her]self away." Tr. 53. Plaintiff

explained that she was "trying really hard," and sometimes she "just need[ed] one or two days just to think about everything" and take "some time for [her]self." Tr. 61.

C. Relevant Law

A two-step process is employed for evaluating a claimant's testimony regarding the severity and limiting effect of the claimant's symptoms. Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" Lingenfelter, 504 F.3d at 1036 (quoting Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). When doing so, "the claimant need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996).

"Second, if the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of [the claimant's] symptoms only by offering specific, clear and convincing reasons for doing so.'" Lingenfelter, 504 F.3d at 1036 (quoting Smolen, 80 F.3d at 1281). A general assertion that the claimant is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995) (internal citation omitted). If the "ALJ's credibility finding is supported by substantial evidence in the record, [the court] may not engage in second-guessing." Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002) (citation omitted).

Effective March 28, 2016, the Commissioner superseded Social Security Ruling ("SSR") 96-7p, governing the assessment of a claimant's "credibility," and replaced it with SSR 16-3p. *See* SSR 16-3p, *available at* 2016 WL 1119029. SSR 16-3p eliminates the reference to "credibility," clarifies that "subjective symptom evaluation is not an examination of an individual's character," and requires the ALJ to consider all of the evidence in an individual's record when evaluating the intensity and persistence of symptoms. *Id.* at *1-2. The ALJ must examine "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *4.

D.  **Analysis**

The ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," and did not find that she was malingering. Tr. 19. However, the ALJ ultimately concluded that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" *Id.*

The ALJ first found plaintiff's symptom allegations were inconsistent with her reported activities of daily living ("ADLs"). *Id.* An ALJ may discount a claimant's symptom testimony if it is inconsistent with the claimant's ADLs or if the claimant's participation in everyday activities indicates capacities that are transferrable to a work setting. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007); *Molina v. Astrue*, 674 F.3d 1104, 1112-13 (9th Cir. 2012). A claimant, however, need not be utterly incapacitated to receive disability benefits, and sporadic completion

of minimal activities is insufficient to support a negative finding. *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001); *see also Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

The ALJ found that the "[a]ctivities [plaintiff] has performed in spite of symptoms strongly suggests that she has been capable of greater functioning than alleged." Tr. 19. Specifically, the ALJ noted that despite plaintiff's "accounts of ongoing nervousness and continued outbursts," plaintiff "remained the primary care giver to her three young children, . . . ages 3, 4, and 7 years old." *Id.* The ALJ further found that plaintiff's increasing childcare activities were inconsistent with her testimony that she did not leave her room at times. *Id.* (citing 3F:32 (Tr. 379) (on December 14, 2012, plaintiff reported that her boyfriend worked "long hours"); 2F:31 (Tr. 336) (recognizing the addition of a new child in March 2014)). Moreover, the ALJ noted that plaintiff expressly denied having limitations with ADLs at her April 2015 psychological evaluation with Dr. Scott Alvord, and informed Dr. Alvord that she was "able to prepare simple meals and keep up with basic chores and caring for her children." Tr. 19 (citing 1F:3 (Tr. 300) ("She denied limitations regarding activities of daily living.")). The ALJ also noted that "on at least two occasions," plaintiff "was able to travel out of state to California to visit family." Tr. 19 (citing 2F:11, 21 (Tr. 316 (noting a visit in late 2014); Tr. 326 (noting a visit in August 2014)).

Plaintiff contends that her childcare activities are not inconsistent with her symptom allegations because she received help from her husband and aunt during periods of exacerbated symptoms. Plaintiff further argues the ALJ erred by failing to develop the record regarding the extent and frequency of her childcare responsibilities. Pl.'s Br. 16, ECF #14 (citing *Trevizo v. Berryhill*, 871 F.3d 664, 6763 (9th Cir. 2017)). In *Trevizo*, there were "no details as to what [the plaintiff]'s regular childcare activities involved." 871 F.3d at 676. Furthermore, the plaintiff

received extensive help from her family with household chores and taking care of her children. *Id.* at 672-73. Specifically, the plaintiff's granddaughter "spent day and night" with the plaintiff and helped her "a lot" because the plaintiff's "tasks did not get compete without her help." *Id.* at 672. The plaintiff's "18-year-old grandson," who also lived with her, "helped her with housework," and her family would watch the children for the plaintiff when she was feeling ill or exhausted. *Id.* at 672-73.

Here, as the ALJ observed, plaintiff testified that her aunt helped "only about twice a week." Tr. 19; *see also* Tr. 39 (plaintiff testified, "She helps me clean, she goes with me to the store and that's mostly it."); Tr. 53 (plaintiff testified that she tried to avoid putting "too much pressure on her [aunt] because she has her own life"). Moreover, the ALJ cited a December 2012 treatment record where plaintiff reported that she was "taking care of two young children (ages 3 and 4 months)" while her husband "work[ed] long hours." Tr. 19 (citing 3F:32 (Tr. 379); *see also* Tr. 39 (plaintiff testified that although her husband was working "part time now," he was still working 30 hours per week). *Trevizo*, therefore, is distinguishable. This court cannot conclude that the ALJ's decision is not supported by substantial evidence in the record. *See Orn*, 495 F.3d at 630 (substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted).[2]

Next, the ALJ found plaintiff's "presentation and performance during a 2015 consultative mental evaluation" administered by Dr. Alvord demonstrated "some degree of functional deficits, but not to the extent that all work would be precluded." Tr. 19. Plaintiff argues the ALJ erroneously relied on her presentation during that examination while also rejecting Dr. Alvord's

---

[2] Notably, plaintiff fails to address the ALJ's finding with respect to her out-of-state travels, which are inconsistent with her allegations that leaving her house for even brief periods of time caused her to experience panic and anxiety. Tr. 44.

11 – OPINION AND ORDER

opinion that was based on that presentation. However, as discussed *infra*, the ALJ gave legally sufficient reasons for rejecting Dr. Alvord's opinion. Moreover, the ALJ relied on plaintiff's psychological evaluation only to the extent that it demonstrated she was capable of performing "simple, routine tasks," which Dr. Alvord also found plaintiff capable of. Tr. 20; *see also* Tr. 302 (Dr. Alvord opining that plaintiff "would not have difficulty performing simple and repetitive tasks").

Finally, the ALJ noted that the severity of plaintiff's symptoms waned with medication and "dosage adjustments." Tr. 20 (citing 2F:28-29 (Tr. 333-34) (noting plaintiff did "really well most days" on Zoloft and was increasing her activity by walking and doing other things around the house)). An ALJ may consider the effectiveness of medication as a factor in determining the severity of a plaintiff's symptoms. *See* 20 C.F.R. § 404.1529(c)(3) (in assessing a claimant's credibility, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication"). "Impairments that can be controlled effectively with medication are not disabling[.]" *Warre v. Comm'r*, 439 F.3d 1001, 1006 (9th Cir. 2006). Thus, the ALJ did not err in rejecting plaintiff's symptom testimony based on her receipt of effective treatment. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004) ("[T]he Commissioner's findings are upheld if supported by inferences reasonably drawn from the record[.]") (citation omitted).

In sum, while the court is sympathetic to plaintiff's traumatic history of abuse, the ALJ provided sufficiently clear and convincing reasons based on substantial evidence for discounting plaintiff's alleged limitations. Accordingly, the ALJ's decision must be upheld.

II.  **Medical Opinion Evidence**

   A.  **Relevant Law**

The ALJ is responsible for resolving conflicts in the medical record, including conflicting physicians' opinions. *Carmickle*, 533 F.3d at 1164. The law distinguishes between the opinions of three types of physicians: treating physicians, examining physicians, and non-examining physicians. *See* 20 C.F.R. § 404.1527.[3] The opinions of treating physicians are generally accorded greater weight than the opinions of non-treating physicians. 20 C.F.R. § 404.1527(c)(2); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). A treating physician's opinion that is not contradicted by the opinion of another physician can be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991). If, however, a treating physician's opinion is contradicted by the opinion of another physician, the ALJ must provide "specific, legitimate reasons" for discrediting the treating physician's opinion. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983). Specific, legitimate reasons for rejecting a physician's opinion may include its reliance on a claimant's discredited subjective complaints, inconsistency with the medical records, inconsistency with a claimant's testimony, or inconsistency with a claimant's activities of daily living. *Tommasetti*, 533 F.3d at 1040.

   B.  **Dr. Alvord**

On April 16, 2015, Dr. Alvord conducted a one-time psychological examination of plaintiff. Tr. 298-303. At the evaluation, plaintiff described a difficult and traumatic upbringing. Specifically, plaintiff reported that her parents were physically and emotionally abusive to her and her siblings, she was "homeless a lot," her mother suffered from drug addiction, and her

---

[3] The Commissioner has issued revised regulations changing this standard for claims filed after March 27, 2017. *See* 20 C.F.R. § 404.1520c. Plaintiff's claim was filed before March 27, 2017, and therefore is controlled by 20 C.F.R. § 404.1527.

13 – OPINION AND ORDER

father had severe depression. Tr. 298. She was "picked on and bullied a lot," and "had lice all the time because [her] parents didn't take care of [her]." Tr. 299. Plaintiff further reported that she was raped when she was 13 years old and became pregnant as a result. *Id.* Although she dropped out of school in the eighth grade, plaintiff was placed "in a continuation school because [she] was pregnant." *Id.* She received "special education assistance beginning during kindergarten," and endorsed that "every class was hard." *Id.* Plaintiff relayed that when she was younger, she "would drink a lot and take pills" and that "maybe [she] was trying to kill [her]self."

Plaintiff further reported "a history of traumatic brain injury related to domestic violence." *Id.* "There were a couple of guys who hit [her] in the head," she had been knocked unconscious "at least a few times," and one occasion she was reportedly "hospitalized for three days secondary to severe concussion." *Id.*[4] Plaintiff believed her history of brain injuries "impacted her neurocognitive abilities." Tr. 300. She indicated that she was fearful much of the time, experienced emotional triggers, struggled with intimacy and trusting others, experienced panic attacks twice per week, and her anxiety was triggered by loud noises, "certain smells[,] and certain things on TV." Tr. 299. She further endorsed feeling lethargic and hopeless much of the time, ongoing suicidal ideation, "hearing voices occasionally," and "seeing shadows out of her periphery." Tr. 300.

Dr. Alvord observed that plaintiff "denied limitations regarding activities of daily living," and was able "to prepare simple meals and keep up with the basic chores and caring for her children." Tr. 300. The doctor found that plaintiff appeared "to be functioning in the low-average range." *Id.* Based on plaintiff's description of her symptoms and a review of available

---

[4] There are no records of this hospitalization in the administrative record.

records, Dr. Alvord diagnosed major depressive disorder, recurrent, severe with psychotic features, and PTSD. Tr. 302. He further diagnosed plaintiff as being in the "borderline range regarding IQ" based on her performance on intelligence testing; however, the doctor noted that "[g]iven . . . her scores are around 80, it is conceivable that she is functioning slightly higher and test scores obtained during this encounter were negatively affected by anxiety." *Id.*

Dr. Alvord assessed that plaintiff "would have difficulty" with the following: performing detailed and complex tasks; accepting instructions from supervisors; interacting with co-workers and the public; performing work activities on a consistent basis without special or additional instructions; maintaining regular attendance in the workplace; completing a normal workday/workweek without interruptions from a psychiatric condition; and dealing with usual stress encountered in the workplace. Tr. 302-03.

The ALJ gave "little weight" to Dr. Alvord's opinion because "the psychologist cursorily noted that [plaintiff] 'would have difficulty' across all functional domains" and "the degree of severity was not explained." Tr. 22 (citing 1F (Tr. 298-305)). Plaintiff asserts that the ALJ's reasoning was "not a specific nor legitimate basis to reject Dr. Alvord's examining medical source opinion." Pl.'s Br. 8, ECF #14. However, an ALJ properly rejects an opinion that is "brief, conclusory, and inadequately supported by clinical findings." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009); *see also Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 601 (9th Cir. 1999) (a medical opinion should demonstrate "how [a claimant]'s symptoms translate into *specific* functional deficits which preclude work activity") (emphasis added).

Further, plaintiff argues that the ALJ erred by failing to translate Dr. Alvord's opinion into concrete limitations in the RFC. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th

15 – OPINION AND ORDER

Cir. 2008). However, as the Commissioner accurately notes, "the ALJ was not required to translate [Dr. Alvord's] opinion into the [RFC]," because the ALJ properly rejected Dr. Alvord's opinion as "too vague to be useful." Def.'s Br. 5, ECF #15. The ALJ therefore provided specific and legitimate reasons for giving little weight to Dr. Alvord's assessment.

### C. Drs. Boyd and Ju

Drs. Boyd and Ju reviewed plaintiff's medical records and assessed several limitations. Tr. 65-75, 77-89, 91-103, 105-117. Relevant here, plaintiff argues the ALJ erroneously failed to account for the doctors' assessments that plaintiff was "moderately limited" in her ability to "accept instructions and respond appropriately to criticism from supervisors." Tr. 86, 101, 115. The Commissioner argues that "[t]he Ninth Circuit has repeatedly rejected arguments . . . that the ALJ should have focused on the 'moderate' assessment of limitations instead of the narrative explanations." Def.'s Br. 5, ECF #15 (citing *Nathan v. Colvin*, 551 F. App'x 404, 406 (9th Cir. 2014); *Israel v. Astrue*, 494 F. App'x 794, 796-97 (9th Cir. 2012)).

Plaintiff attempts to distinguish *Nathan* and *Israel* from her case based on differences in the format of the Mental Residual Functional Capacity ("MRFC") forms. However, the MRFC assessments completed by Drs. Boyd and Ju expressly state that "the actual mental residual functional capacity assessment is recorded in the narrative discussion(s), which . . . is documented in the explanatory text boxes following each category of limitation[.]" Tr. 85, 100, 114. Thus, the reviewing doctors' notation that plaintiff was "moderately limited" in her ability to accept instructions and respond appropriately to supervisors was not the doctors' "considered medical assessment[s]." *Israel*, 494 F. App'x at 797. Rather, the reviewing doctors' opinions were contained within their narrative assessments that plaintiff "would work best in an environment without frequent contact with coworker [sic] and the public, as this will increase

symptoms." Tr. 86, 101, 115. The ALJ gave "great weight" to that portion of the doctors' opinions and appropriately limited plaintiff's RFC to no more than "occasional contact with the general public and with coworkers." Tr. 18, 22. Accordingly, the ALJ did not err.

### C. Joanne Rutland, PMHNP

Plaintiff argues the ALJ erred in giving "little weight" to PMHNP Rutland's December 2015 letter, which recommends that plaintiff not pursue employment due to her symptom level. Tr. 22, 348. As a nurse practitioner, PMHNP Rutland is considered a non-acceptable medical source. SSR 06-3p, *available at* 2006 WL 2329939, at *2. Evidence from non-acceptable medical sources may be used to show the severity of a claimant's impairments and how they affect a claimant's ability to work. *Id*. However, unlike an acceptable medical source, an ALJ need only give germane reasons for rejecting non-acceptable medical source opinions. *Molina*, 674 F.3d at 1111.

Here, the ALJ rejected PMHNP Rutland's letter, in part, because it said that the recommendation "can be re-evaluated in six months," "which falls well short of the requisite duration of 12 consecutive months or longer." Tr. 22. Plaintiff argues the ALJ erred by failing to consider whether PMHNP Rutland's recommendation was retrospective, given Rutland had been treating plaintiff since October 2014. Tr. 348. PMHNP Rutland, however, conditioned her recommendation on plaintiff's symptoms "[a]t th[at] time." *Id*. Thus, the ALJ's interpretation of the record was reasonable and based on substantial evidence. That PMHNP Rutland's recommendation was only temporary was a sufficiently germane reason for giving little weight to the December 2015 letter.

Moreover, the ALJ properly gave little weight to PMHNP Rutland's letter because "the issue of whether the claimant is able to work is one reserved to the Commissioner." Tr. 22. As

such, a statement by a medical source that a claimant is "unable to work" will not be given "any special significance." 20 C.F.R. §§ 404.1527(d)(3); 416.927(d)(3). Although plaintiff correctly observes that an ALJ must still "review all of the medical evidence and other evidence that support a medical source's statement that [the claimant] is disabled," plaintiff's assertion that the "ALJ failed to do so in this case" is without merit. Pl.'s Br. 13, ECF #14 (citing 20 C.F.R. §§ 404.1527(d)(1); 416.927(d)(1)). The ALJ thoroughly discussed plaintiff's treatment with PMHNP Rutland in his summary and analysis of the medical evidence. Tr. 22. Because PMHNP Rutland's recommendation that plaintiff not seek employment touched on an issue reserved to the Commissioner, the ALJ did not err.

## III. Lay-Witness Testimony

Lay-witness testimony regarding the severity of a claimant's symptoms or how an impairment affects a claimant's ability to work is competent evidence that an ALJ must take into account. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996). To reject such testimony, an ALJ must provide "reasons that are germane to each witness." *Rounds v. Comm'r*, 807 F.3d 996, 1007 (9th Cir. 2015) (quoting *Molina*, 674 F.3d at 1114). Further, the reasons provided must be "specific." *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1234 (9th Cir. 2011) (citing *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009)). Where the ALJ has provided clear and convincing reasons for rejecting the claimant's symptom testimony, and the lay witness has not described limitations beyond those alleged by the claimant, the ALJ's failure to provide germane reasons for rejecting lay testimony is harmless. *Molina*, 674 F.3d at 1121-22.

Plaintiff's husband and sister submitted lay witness statements describing limitations that are substantially similar to those alleged by plaintiff. Tr. 257-64, 276. The ALJ gave "little to no weight" to the lay witness statements for the same reason he rejected plaintiff's subjective

symptom testimony. Tr. 22 ("[a]s with the claimant's allegations, the record as a whole strongly suggested that she has been capable of greater functioning than contended. . . . [F]or example, in spite of symptoms, the claimant has been the primary care giver to three young children for nearly the entirety of the period at issue"). As discussed *supra*, the ALJ's reasons for rejecting plaintiff's subjective symptom testimony were clear and convincing; thus, those reasons apply with equal force to the lay witness statements of plaintiff's husband and sister. The ALJ's treatment of the lay witness statements therefore cannot be disturbed.

## CONCLUSION

The Commissioner's decision is AFFIRMED.

IT IS SO ORDERED.

DATED December 30, 2019.

/s/ Youlee Yim You
Youlee Yim You
United States Magistrate Judge